## SMITH v. UNITED STATES.

(Court of Appeals of District of Columbia.
Submitted December 7, 1926. Decided
January 3, 1927.)

No. 4460.

1. **Witnesses** ⟻380(5)—**Permitting government showing surprise at testimony of accomplice, to question him concerning prior written statement, and to read it to jury, held not error (Code, § 1073a).**

In prosecution for robbery, where accomplice as state's witness categorically denied every material statement contained in written statement previously made by him, it was not error, under Code, § 1073a, to permit government, on showing of surprise, to question witness concerning such written statement, and to read it to the jury.

2. **Witnesses** ⟻387—**Extent of cross-examination of witness, testifying contrary to prior statements, is within discretion of judge.**

Latitude to be allowed in the examination of a witness, who has testified contrary to expectations and prior written statement, is within discretion of trial judge.

3. **Robbery** ⟻24(1)—**Evidence held to sustain conviction of robbery.**

Evidence, aside from testimony of accomplice, held to sustain conviction for robbery of pedestrian.

Appeal from Supreme Court of District of Columbia.

Dennis L. Smith was convicted of robbery, and he appeals. Affirmed.

William Wendell, of Washington, D. C., for appellant.

Peyton Gordon and Raymond Neudecker, both of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and HATFIELD, Judge of the United States Court of Customs Appeals.

ROBB, Associate Justice. Appellant was convicted in the Supreme Court of the District of Columbia of the crime of robbery and sentenced to serve a term of 15 years in the penitentiary. The facts are substantially as follows:

As Charles Turner, in the early morning of July 26, 1925, was walking toward his home, 1231 Massachusetts avenue, S. E., near which he then was, a man afterward identified as Belhummer robbed him, at the point of a revolver, of a diamond pin worth about $700, a ring of considerable value, and $47 in money. Belhummer then ran to a Ford sedan, standing not far distant, and escaped. Turner noticed that another person was in the automobile as it moved away.

Soon thereafter Belhummer and appellant, hereinafter referred to as the defendant, were arrested, and Turner identified Belhummer as the man who had robbed him. Belhummer freely confessed his part in the crime, entered a plea of guilty, and was sentenced to 15 years in the penitentiary.

Belhummer told the detectives that he met defendant before the night of the robbery in a poolroom on Ninth street; that defendant told him he knew a man named Turner, who wore diamonds and was reputed to carry a considerable sum of money around with him; that it would be easy to "take" Turner; that he (Smith) would do the job himself, but for the fact that Turner knew him; and Smith offered to point Turner out to Belhummer. Defendant thereupon procured a gun and cap for Belhummer, who had neither, and arranged a meeting on the Saturday night following, which was the night the robbery was committed. The gun and cap were left meanwhile in defendant's Ford machine. Between 11 and 12 o'clock on Saturday night, as previously arranged, defendant and Belhummer met, and defendant drove his automobile by Turner's house three or four times; defendant finally pointing out Turner to Belhummer. Defendant then waited for Belhummer to commit the robbery, and thereafter drove away with him in the machine. They divided the money immediately, and later defendant sold the pin to a Mr. Cady for $200, and gave Belhummer half the proceeds as his share. Defendant also gave Belhummer $35 and took the ring himself.

Cady testified that he bought the diamond pin from defendant for $200, and later turned it over to the police department; that defendant then told him he needed the money for some one for whom he was selling the ring.

A police officer testified that he was present at a conversation between Cady and defendant, after defendant's arrest; that prior to this conversation defendant had denied all knowledge of the pin; that Cady then was brought in, and, when asked about his purchase of the pin from defendant, stated he had rather not talk about it in defendant's presence. Finally Cady said to defendant: "Go ahead and tell about the pin. I don't want to tell anything about it. I don't want to be called a squawker." Defendant then said: "All right, Cady; go ahead and tell them. There will be no hard feelings one way or the other as far as I am concerned." Cady then said: "I bought the pin from Smith and paid $200 for it." Defendant

then was asked what he had to say about the matter and responded: "It is a long story. I will tell it in court. I would rather see my lawyer."

Ethel V. Murphy, connected with the rooming house where Belhummer was staying at the time of the robbery, testified that defendant visited Belhummer on one or more occasions shortly after the robbery, and on one occasion at least came there in a Ford sedan. There was also testimony that at the time of defendant's arrest there was found in his Ford sedan the revolver and cap used by Belhummer at the time of the robbery.

Belhummer had made a detailed statement to assistant district attorneys and police officers, which was reduced to writing and signed and sworn to by him. Before court convened on the day Belhummer was offered as a witness on behalf of the government, he stated to the assistant district attorney in charge of the prosecution that the statement theretofore made by him, and to which we have referred, was true. Upon taking the stand, however, he stated that he was alone when the robbery was committed, and saw Smith for the first time the next day. In short, he entirely exculpated the defendant from any part in the crime. Counsel for the government, upon the ground of surprise, sought and obtained from the court leave to cross-examine the witness. In granting this request the court cautioned the jury as follows: "This witness here, introduced as a witness for the government, testified, and the government counsel thereupon stated he was surprised in his testimony, substantially to the effect that he expected him to testify differently from what he did, and in substantiation of this he has produced here a written, rather a typewritten, statement, which the witness admits that he had signed, but now this typewritten statement cannot be considered by you as any testimony of the guilt of the defendant in this case. In other words, it was a statement which was not made in court. It is simply admissible in order that the government may show that, in introducing this witness, they had reason to believe he would testify differently, and therefore to impeach this witness, so that the government will not be bound by the testimony he has given in this case; but it is not evidence of the facts stated in the paper at all."

Belhummer was examined in detail as to every material statement contained in the typewritten statement signed by him, and de-

nied categorically that he had made them. This statement then was read to the jury, over the objection and exception of the defendant. Belhummer was the only witness offered on behalf of the defendant.

[1, 2] Section 1073a of our Code provides that, whenever the court shall be satisfied that the party producing a witness has been surprised by his testimony, that party, in the discretion of the court, may be allowed to prove, for the purpose of affecting the credibility of the witness, that he has made to such party or his attorney statements substantially variant from his sworn testimony on material facts in the case, but that, before such proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he made such statements, and be given an opportunity to explain them. This section of the Code merely reduced to concrete form the established rule. Hickory v. United States, 151 U. S. 303, 309, 14 S. Ct. 334, 38 L. Ed. 170; St. Clair v. United States, 154 U. S. 134, 150, 14 S. Ct. 1002, 38 L. Ed. 936; Putnam v. United States, 162 U. S. 687, 702, 16 S. Ct. 923, 40 L. Ed. 1118; Di Carlo v. United States (C. C. A.) 6 F.(2d) 364; Smith v. Briscoe, 65 Md. 561, 5 A. 334. The latitude to be allowed in the examination of a witness in such circumstances is within the discretion of the judge. Here every requirement of the rule was complied with, and there was every reason for permitting cross-examination of the witness. It is the duty of the court to administer justice, rather than to encourage a perversion thereof.

[3] The further contention is made that, aside from the testimony of Belhummer, there was no evidence upon which to base a conviction. The foregoing statement of the evidence is a sufficient answer to this contention.

We have examined all other suggestions of error, and found them to be without merit. An examination of the record, including the charge of the court, convinces us that the defendant has had a fair trial, and that his guilt was fully established before the jury. The judgment is affirmed.

Affirmed.

Motion was made to stay the mandate pending petition to the Supreme Court for writ of certiorari, which motion has been denied.